UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | | | |
|---|---|---|---|
| A.T., a minor student, by and through | ) | | |
| her parents and next friends, | ) | | |
| B.G. and J.G., and | ) | | |
| B.G. and J.G. in their individual capacities, | ) | | |
| | ) | | |
| Plaintiffs, | ) | | |
| | ) | | |
| v. | ) | | |
| | ) | | |
| CLEVELAND CITY SCHOOLS | ) | | |
| BOARD OF EDUCATION; | ) | | |
| CLEVELAND MIDDLE SCHOOL; | ) | | |
| MS. LENEDA LAING, in both her | ) | | |
| official and individual capacity as | ) | | |
| Principal of Cleveland Middle School; | ) | No.: | 1:22-CV-110-TAV-SKL |
| MS. STEPHANIE PIRKLE, in both her | ) | | |
| official and individual capacity as | ) | | |
| Vice-Principal of Cleveland Middle School; | ) | | |
| MS. LAURA LASTORIA, in both her | ) | | |
| official and individual capacity as | ) | | |
| 6th Grade Counselor at | ) | | |
| Cleveland Middle School; | ) | | |
| MS. TERRY ESQUINANCE, in both her | ) | | |
| official and individual capacity as | ) | | |
| A.T.'s Homeroom Teacher; | ) | | |
| MS. ASHLEY KEITH, in both her | ) | | |
| official and individual capacity as | ) | | |
| A.T.'s Math Teacher; and | ) | | |
| MATTHEW INGRAM, in both his | ) | | |
| official and individual capacity as | ) | | |
| Seventh Grade Vice Principal, | ) | | |
| | ) | | |
| Defendants. | ) | | |

**MEMORANDUM OPINION**

Before the Court is defendants' motion for summary judgment [Doc. 37]. The motion

has been fully briefed [Docs. 39, 41, 44, 45, 46] and is ripe for review. *See* E.D. Tenn. L.R.

7.1(a).  For the reasons that follow, defendants' motion for summary judgment [Doc. 37] is **GRANTED**.   This case will be **DISMISSED**.

## I.    Background

A.T., a minor, and her mother and step-father, B.G. and J.G., respectively, brought this action alleging that defendants were deliberately indifferent to extreme student-on-student sexual harassment, sexual assault, sexual battery, and bullying, specifically in relation to A.T. while she was a student at Cleveland Middle School ("CMS") [Doc. 21 ¶ 1].   Plaintiffs specifically bring claims against CMS and the Cleveland City Schools Board of Education ("CCSBE") for violations of Title IX of the Education Amendments of 1972 [*Id.* ¶¶ 75–83]. Additionally, plaintiffs bring claims against all defendants under 42 U.S.C. § 1983 and the Tennessee Governmental Tort Liability Act ("GTLA"), as well as state tort claims of negligent or intentional infliction of emotional distress and negligence per se [*Id.* ¶¶ 84–105].

On September 15, 2023, defendants filed the instant motion for summary judgment [Docs. 37, 39].   Plaintiffs filed an untimely response [Doc. 41], and defendants replied [Doc. 44].   Plaintiffs filed a surresponse [Doc. 45], and defendants responded [Doc. 46].

### A.    Initial Disputes

#### 1.    Plaintiff's Untimely Response Brief

As an initial matter, the Court must decide whether to consider plaintiffs' untimely response.   Pursuant to the Local Rules of this Court, plaintiffs had 21 days in which to respond to defendants' motion for summary judgment, which was filed on Friday, September 15, 2023. *See* E.D. Tenn. L. R. 7.1(a).   Plaintiffs' response was thus due Friday, October 6, 2023. Plaintiffs did not respond to defendants' motion until October 25, 2023, 20 days after the deadline had expired.   Plaintiffs did not seek an extension of time to file their response prior

2

to the deadline's expiration nor did the plaintiffs seek leave from the Court to file a belated response. As such, defendants argue that the Court should disregard plaintiffs' untimely response [Doc. 44, pp. 2–3].

Plaintiffs respond that their failure to meet the 21-day deadline was due to inadvertent oversight, confusion as to the applicable rules, and difficulty in marshaling additional evidence in a timely fashion [Doc. 45, p. 1]. In an attached affidavit, Attorney Jonathan Thomas states that his failure to seek leave from this Court to file a belated response was due to his reliance on another attorney's advice that belated submissions should be worked out amongst the parties, and that a response could be filed any time before defendants filed a motion for default [Doc. 45-1, p. 2].

Defendants argue that plaintiffs' counsel has not provided good cause as to why the response brief was late to begin with and note that defense counsel advised Attorney Thomas of the need to seek leave from the Court for an extension of time to respond [Doc. 46, p. 3].

"[D]eadlines are important things. And when the Court establishes deadlines, the parties are obliged to follow them." *Century Indemnity Co., v. Begley Co.*, 323 F.R.D. 237, 239 (E.D. Ky. 2018). And the court is not required to consider an untimely response. *See Brooks v. Invista*, No. 1:05-CV-328, 2007 WL 470401, at *1, *9 (E.D. Tenn. Feb. 7, 2007) (declining to consider a response to motion for summary judgment because it was untimely filed); *U.S. v. Pleasant*, 12 F. App'x 262, 269 (6th Cir. 2001). Consequently, it is within a court's discretion "to decline to extend the deadline for responses and disregard a party's late-filed briefs under Fed. R. Civ. P. 6 when that party failed to submit any timely response to the opposing party's motions." *Bridgestone Brands, LLC v. Apollo Auto Sales & Servs., Inc.*, No. 15-CV-857, 2017 WL 11476333, at *5 (internal quotation marks and alterations omitted).

3

However, the Court notes the strong preference for adjudications of matters on the merits. *See Mann v. Mohr*, 802 F. App'x 871, 877 (6th Cir. 2020) (noting "the strong policy favoring adjudication on the merits" (quotation marks omitted)); *Rose v. Soc. Sec. Admin.*, 202 F.3d 270, No. 98-6491, 1999 WL 1253074, at *1 (6th Cir. Dec. 17, 1999) (unpublished table opinion) ("[T]his court prefers that claims be adjudicated on their merits."); *Coburn v. L.J. Ross Assocs., Inc.*, No. 14-CV-11080, 2015 WL 1926398, at *4 (E.D. Mich. Apr. 28, 2015) ("There is a strong preference for adjudicating cases on the merits[.]").

While the Court *may* decline to consider plaintiffs' untimely response, in this instance, as the merits of the case at hand are contested and noting the preference for adjudication on the merits of a claim, the Court, in its discretion, will consider the contents of plaintiffs' response.

### 2. Plaintiffs' Surresponse

Next, defendants contend that the Court should not consider plaintiffs' surresponse [Doc. 46].

Pursuant to the Local Rules of this Court, "[n]o additional briefs, affidavits, or other papers in support of or in opposition to a motion shall be filed without prior approval of the Court, except that a party may file a supplemental brief of no more than 5 pages to call to the Court's attention developments occurring after a party's final brief is filed." E.D. Tenn. L.R. 7.1(d). The plaintiffs did not obtain prior approval from the Court before filing their surresponse, which is six pages long and does not address new developments in the case.

While plaintiffs' surresponse does not comply with the Court's Local Rules, this Court, in exercising its discretion, will consider the plaintiffs' surresponse [Doc. 45] and the defendants' reply to plaintiffs' surresponse [Doc. 46] in the matter before this Court.

4

### 3. Undisclosed Witness

The Court now turns to whether the affidavit of G.H., which is attached to plaintiffs' response brief [Doc. 41-10], should be stricken.

By way of background, plaintiffs contend that the defendants "exhibited deliberate indifference to Plaintiff A.T. by subjecting her to an assembly in which the subject of sexual harassment was explicitly discussed in relation to lawsuits, subjecting her to additional harassment, embarrassment, and trauma" [Doc. 41, pp. 13–14]. Plaintiffs state that Matt Ingram's students recall Ingram, who was the seventh-grade assistant principal of CMS at the time, discussing lawsuits in relation to sexual harassment during the assembly [*Id.* at 14]. In support, plaintiffs cite to A.T.'s attached deposition and an affidavit from G.H., who was one of A.T.'s seventh-grade classmates [*Id.*; *see also* Doc. 41-9; Doc. 41-10].

Defendants argue that this Court should strike G.H.'s affidavit because G.H. was not disclosed as a witness to the defendants in response to initial disclosures or discovery requests [Doc. 44, p. 16]. Defendants state that, because of the nondisclosure, they did not have the opportunity to depose G.H. or conduct written discovery concerning G.H.'s knowledge [*Id.* at 17–18].

Plaintiffs argue that the Court should not strike G.H.'s affidavit because "[p]laintiffs and counsel were unaware as to whether G.H. would be able to testify until the day before the filing of" plaintiffs' response brief [Doc. 45, p. 3]. The plaintiffs argue that, at the time of their initial disclosures, they were unaware of the necessity of calling G.H. as a witness during trial, and therefore, "had no reasoning to list G.H. as a potential witness at that time" [*Id.*]. It was only after Ingram's deposition and the filing of defendants' summary judgment motion that it became apparent to plaintiffs that they would need a rebuttal witness regarding the assembly

5

[*Id.* at 3–4]. Plaintiffs state they were able to obtain the statement of G.H., a classmate of A.T.'s who witnessed the assembly, but they did not obtain a copy of G.H.'s affidavit until the day before they filed their response to defendants' summary judgment motion [*Id.* at 3–4]. Thus, plaintiffs claim "it was impracticable to advise Defendants[] of Plaintiffs' intention to use G.H. as a rebuttal witness[] and literally impossible for them to do so when submitting their Initial Disclosures" [*Id.*].

Defendants note that Ingram's deposition took place on July 28, 2023, approximately three months before plaintiffs' response brief [Doc. 46, p. 4]. The defendants also state that in addition to plaintiffs not disclosing G.H. in their initial disclosures, the plaintiffs "also did not disclose G.H. in their discovery requests or supplement the same prior to filing their untimely Response" [*Id.*]. Defendants claim that plaintiffs' nondisclosure of witnesses just days before the discovery deadline unfairly prejudices them as they were not afforded the opportunity to depose G.H. [*Id.*].

Under Federal Rule of Civil Procedure 26(a)(1)(A)(i), a party must provide to the other parties as an initial disclosure "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support their claims or defenses, unless the use would be solely for impeachment." Furthermore, a party who has made initial disclosures under Rule 26(a) must supplement or correct its disclosure or response "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). When a party fails to identify a witness as required under Federal Rules of Civil Procedure

26(a) and (e), "the party is not allowed to use that . . . witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Plaintiffs readily admit that they did not provide the defendants with the identity of G.H. prior to filing their response brief [Doc. 45, pp. 3–4]. Plaintiffs state that their failure to disclose G.H. was because they were "unaware of the necessity of calling G.H. as a witness during trial" and therefore had no reason to identify G.H. at the time of their initial disclosure [*Id.* at 3]. But plaintiffs misread the Federal Rule of Civil Procedure 26(a)(1)(A)(i). Parties are not required to disclose only individuals who they *will* use as witnesses at trial; rather, Rule 26(a)(1)(A)(i) requires parties to disclose any individual likely to have discoverable information "that the disclosing party *may* use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(i) (emphasis added). The standard is potentiality not certainty. *See In re Sonic Corp. Customer Data Sec. Breach Litig.*, No. 1:17MD02807, 2018 WL 11255772, at *4 (N.D. Ohio Apr. 17, 2018) (hereinafter "*Sonic Corp.*") (stating that if, as the plaintiffs suggest, parties were only required to disclose those they *intended* to use to substantiate their claims, rather than those they *may* use, the power of Rule 26's disclosure requirements would be eroded). Thus, plaintiffs' belated realization of their *need* for G.H. as a rebuttal witness does not justify their failure to disclose G.H. in their initial disclosures.

Even if the Court were to assume that the plaintiffs were not required to disclose the identity of G.H. in their initial disclosures, the plaintiffs also failed to supplement their initial disclosures and notify the defendants of G.H.'s identity once they realized G.H. may be used to support their claims and act as a rebuttal witness. *See* Fed. R. Civ. P. 26(e). As stated previously, plaintiffs claim that they only realized G.H. would be necessary after Ingram's deposition, which took place on July 28, 2023, and the defendant's summary judgment motion,

7

which was filed September 15, 2023.[1]  While it is unclear when exactly plaintiffs' realization struck, plaintiffs' response brief was not filed until October 25, 2023, more than a month after the defendants' summary judgment motion.  And it is clear that plaintiffs would not have acquired G.H.'s affidavit were they not aware of G.H's identity and in contact with G.H. or G.H.'s representative.  Thus, plaintiffs plainly failed to supplement their initial disclosure as required by Rule 26(e).  Notably, although plaintiffs state that it was impracticable for them to advise defendants of their intention to use G.H. as a rebuttal witness because the plaintiffs did not receive G.H.'s affidavit until the day before they submitted their response brief [Doc. 45, p. 4], receiving a copy of a witness's affidavit is not the triggering mechanism for notifying opposing parties of that witness's identity.  Rather, it is the disclosing party's potential for using that individual to support their claims or defenses which triggers the necessity of disclosure.  *See Sonic Corp.*, 2018 WL 11255772, at *4.

Given plaintiffs' failure to identify G.H. as a witness under Rules 26(a) and (e), plaintiffs are not allowed to use G.H. "to supply evidence on a motion . . . unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  As explained above, plaintiffs offer no proper justification for their failure to identify G.H. as a witness.  Rather, their justification lies in a misreading of the Rules.  Further, the plaintiffs' failure to disclose is

---

[1] Plaintiffs' belated realization is perplexing.  Plaintiffs state that during discovery and the preparation of their response to defendants' summary judgment motion, it became apparent that they "needed a means to rebut Defendants' assertion that the subject of sexual assault was not discussed in the virtual assembly conducted by Defendant Ingram on April 19, 2021, and in particular, Defendant Ingram's denial of the same during his deposition" [Doc. 45, p. 3].  However, in defendants' answer to plaintiffs' amended complaint, the defendants deny all of the plaintiffs' allegations related to Ingram and his discussion during the assembly [Doc. 22 ¶¶ 61–67].  Thus, it should have been apparent since November 4, 2022, when the answer to the amended complaint was filed, that plaintiffs would need a means to rebut defendants' denial of what was discussed at the assembly.

not harmless. As of the date of defendants' summary judgment motion, the trial in this case was set for February 13, 2024, meaning the discovery deadline was November 15, 2023. G.H. was not disclosed as a witness until plaintiffs' untimely responsive filing on October 25, 2023, only 20 days before the discovery deadline. This late disclosure harmed defendants such that they were not given sufficient time to depose G.H. or conduct written discovery before the discovery deadline.

Therefore, due to the plaintiffs' failure to identify G.H. as a witness, and the failure being neither justified nor harmless, the plaintiffs cannot use G.H.'s affidavit in support of their response to defendants' summary judgment motion. Thus, the affidavit [Doc. 41-10] is **STRICKEN** and will not be considered by the Court.[2]

### B. Evidence

#### 1. Incidents Involving A.T. and J.B.

In the fall of 2019, A.T. was in the sixth grade at CMS [Doc. 37-1, p. 4]. On or before September 18, 2019, A.T. was sexually assaulted on three separate occasions by another sixth-grade student, J.B. [*Id.* at 5; Doc. 37-3, pp. 6, 10–11]. A.T. testified that on each of these occasions, J.B. grabbed her "butt" [Doc. 37-1, pp. 7, 9]. After the third occasion, A.T. told her friend, O.M., what had happened [*Id.* at 7, 27]. O.M. then told two of A.T.'s teachers, Ashley Keith and Terry Esquinance, what A.T. had said [*Id.* at 27]. Keith and Esquinance pulled A.T. out of the classroom to discuss what O.M. had reported to them [*Id.* at 7, 27]. At about the same time, two male students went to CMS Vice Principal Stephanie Pirkle's office to report

---

[2] Although stricken, even if the Court were to consider the affidavit, it would not change the Court's analysis *infra*.

9

that J.B. had threatened them if they told anyone that he was harassing A.T. [Doc. 37-4 ¶ 4]. In their written statements, the male students wrote that people had started saying that J.B. wanted to rape "a girl" or "girls," but neither of the students knew if this was true [Doc. 37-5].

After speaking with the two male students, Pirkle immediately removed J.B. from class and placed him in in-school-suspension ("ISS") [Doc. 37-4 ¶ 5]. Then, Pirkle met with A.T. to learn what had happened between A.T. and J.B. [*Id.*; Doc. 37-1, p. 8]. A.T. wrote a summary describing the incidents that occurred:

> The person who did this is [J.B.]. When I was opening my locker he walked by me and grabbed my bottom. This has happened 2 times before. I was afraid to say anything because I though he was going to do something [sic] to me. The other day he said he was going to "rape" me.

[Doc. 37-6]. Pirkle also met with J.B. [Doc. 37-4 ¶ 5]. Finally, Pirkle spoke with Keith and Esquinance about what O.M. had told them regarding J.B. and A.T. [*Id.*]. Pirkle then placed J.B. in out-of-school suspension ("OSS") for the rest of the week [*Id.* ¶ 7]. Pirkle then referred the matter to School Resource Officer ("SRO") Raul Cruz, giving him the hand-written statements and relaying the verbal statements made by A.T., the two male students, J.B., and Esquinance [*Id.* ¶¶ 6–7; Doc. 37-8, p. 4]. In conducting his own investigation, SRO Cruz spoke with Assistant District Attorney Krista Oswalt, and she advised that J.B. be placed under arrest, charged with sexual assault, and held at the Juvenile Detention Center [Doc. 37-8, p. 4]. SRO Cruz spoke with the Juvenile Detention Center, arrested J.B., and filed a juvenile petition against J.B. for sexual battery [*Id.* at 5; *see* Doc. 37-4 ¶ 7].

On September 18 or 19, 2019, Pirkle attempted to call B.G. and J.G. to inform them of what had happened to A.T. [Doc. 37-4 ¶ 10]. No one answered the phone, and Pirkle did not

leave a voicemail due to the nature of the information [*Id.*]. Pirkle also believed that SRO Cruz had contacted A.T.'s parents given that J.B. had been arrested [*Id.*].

## 2. Department of Children's Services Meeting

On September 23, 2019, a representative from the Department of Children's Services ("DCS") contacted B.G. and requested to meet with her concerning A.T. [Doc. 37-3, p. 4]. B.G., J.G., and A.T.'s birthfather all attended the September meeting with the DCS representative [*Id.*; Doc. 37-9, p. 4]. During this meeting, the DCS representative informed B.G., J.G., and A.T.'s birthfather that A.T. had been touched or slapped on the bottom by another student,[3] and this student was taken to the Juvenile Detention Center [Doc. 37-3, pp. 4–5; Doc. 37-9, pp. 4–5]. Additionally, the DCS representative stated that the student was still at the Juvenile Detention Center at the time of their meeting. [Doc. 37-3, p. 5; Doc. 37-9, p. 5]. B.G. recalled the DCS representative stating that the student would be placed in the Raider Blue Academy ("RBA") upon his return to CMS, which was in a separate hallway of the school and away from where A.T. would be [Doc. 37-3, p. 5].

The DCS representative also told B.G., J.G., and A.T.'s birthfather to not discuss the incident with A.T., to prevent A.T. from feeling like a victim [*Id.*]. J.G. stated he did not contact CMS or CCSBE after the DCS meeting [Doc. 37-9, p. 6].

## 3. Discussions with A.T.

After the DCS meeting, B.G. and J.G. did not immediately ask A.T. about what had happened or who her assailant was, nor did A.T. tell them [Doc. 37-3, p. 5; Doc. 37-9, p. 5; Doc. 37-1, pp. 13–14]. Instead, B.G. and J.G. allowed A.T. to tell them what happened over

---

[3] B.G., J.G., and A.T.'s birthfather did not learn the name of the student, J.B., at the meeting with the DCS representative [Doc. 37-3, p. 5; Doc. 37-9, p. 4].

time [Doc. 37-3, p. 5; Doc. 37-9 p. 5]. However, B.G. stated that A.T.'s birthfather talked to A.T. about what had occurred, and A.T.'s birthfather relayed this information to B.G. and J.G. [Doc. 37-3, p. 5]. According to B.G., A.T.'s birthfather relayed to them that the incident between A.T. and J.B. was worse than "just a pat on the bottom," stating that A.T. had told him that J.B. had groped A.T., pushed A.T. against a locker, and threatened other students who were present at the incident [*Id.*].

#### 4. Mutual No Contact Order

On September 19, 2019, a Mutual No Contact Order was entered and filed in the Juvenile Court of Bradley County, Tennessee [Doc. 37-11]. The Mutual No Contact Order restrained J.B. from having any contact with A.T. [*Id.*; Doc. 37-3, p. 7].

On September 26, 2019, B.G. was served with the Mutual No Contact Order between A.T. and J.B. [Doc. 37-3, pp. 6–7; Doc. 37-11]. B.G. and J.G. found out that J.B. was A.T.'s assailant from the Mutual No Contact Order [Doc. 37-3, p. 7]. Neither B.G. nor J.G. communicated with anyone at CMS or CCSBE regarding the Mutual No Contact Order [*Id.*; Doc. 37-9, p. 11]. Additionally, neither B.G. nor J.G. gave the Mutual No Contact Order to anyone at CMS or CCSBE until October 20, 2020, when J.G. emailed the order to Ingram, the seventh-grade CMS assistant principal [Doc. 37-3, p. 8; Doc. 37-9, pp. 11–12; Doc. 37-1, p. 22]. B.G. claims that J.G. asked the server of the Mutual No Contact Order if the Order needed to be given to the school and that J.G. was told that "everyone" had a copy of the Order [Doc. 37-3, pp. 7–8]. However, no one at CMS or CCSBE was notified about the Order until it was emailed to Ingram on October 20, 2020 [Doc. 37-12 ¶ 4; Doc. 37-13 ¶ 3; Doc. 37-14 ¶ 5; Doc. 37-15 ¶ 5; Doc. 37-16 ¶ 3; Doc. 37-17 ¶ 4].

12

J.G. stated that his understanding was that the Mutual No Contact Order would be in place for a minimum of a year, and he stated that he did not ask the juvenile court to extend the Order [Doc. 37-9, pp. 8–9]. B.G. and A.T. stated they were unaware of how long the Order would be in place, and both were unaware as to whether the Order was ever extended [Doc. 37-3, p. 12; Doc. 37-1, p. 14].

### 5. November 2019 Parent-Teacher Conference

On November 8, 2019, Jim Stansel, one of A.T.'s sixth-grade teachers, emailed B.G. to arrange for a parent-teacher conference to discuss A.T.'s progress that school year [Doc. 37-18]. Stansel, Esquinance, and Keith met with B.G. and J.G. on November 12, 2019, to discuss A.T. performing poorly in her classes [Doc. 37-19; Doc. 37-3, p. 9]. B.G. claims that when the teachers expressed their concerns about A.T's grades, she and J.G. mentioned that "something had happened" [Doc. 37-3, p. 9]. After mentioning this, B.G. claims that Esquinance and Keith gave her more details regarding the incident between J.B. and A.T. which led to J.B.'s arrest [*Id.* at 9–10]. B.G. stated that she was upset that the teachers knew more about the incident than she did, stating she had not learned of those details from A.T. [*Id.* at 10].

Besides the parent-teacher conference, B.G. and J.G. state that they did not contact anyone at CMS or CCSBE regarding the incident between A.T. and J.B. [Doc. 37-3, p. 15; Doc. 37-9, p. 10]. However, Pirkle states that she spoke with J.G. after the parent-teacher conference, and J.G. advised that he was upset that he had not been contacted sooner by the school [Doc. 37-4 ¶ 10]. Pirkle states that she apologized to J.G., telling him that she believed he had been contacted by SRO Cruz or the juvenile court about the incidents between A.T. and J.B. [*Id.*].

13

### 6. December 2019 Court Appearance

On October 3, 2019, A.T. and B.G. were summoned to appear on December 12, 2019, in juvenile court in the case against J.B. [Doc. 37-20]. After arriving at juvenile court, the District Attorney spoke with B.G. and J.G. about J.B.'s case and informed them that there was more than one incident between A.T. and J.B. [Doc. 37-3, p. 11; Doc. 37-9, p. 7]. B.G. and J.G. stated that this was the first time they were made aware that multiple incidents between A.T. and J.B. had occurred [*Id*.]. B.G. and J.G. stated that they informed the District Attorney that the school had not contacted them regarding the incidents between J.B. and A.T. [*Id*.].

Steven Rogers was also present in juvenile court on December 12, 2019 [Doc. 37-3, p. 12; Doc. 37-9, p. 7; Doc. 37-1, p. 18]. In 2019, Rogers worked as a Youth Services Officer ("YSO") for Bradley County Juvenile Court working with CMS students, though Rogers is employed by the County rather than CMS or CCSBE [Doc. 37-21 ¶¶ 2–3]. In his position, Rogers is required to appear in court whenever CMS students face charges and has a court date [*Id.* ¶ 5]. Rogers does not contact, work with, or discuss case details with schools, boards of education, or victims [*Id.* ¶¶ 8–9]. During 2019, Rogers was also a volunteer softball coach for CMS's sixth-grade softball team [*Id.* ¶ 4]. However, he never appeared or was present in juvenile court as a volunteer softball coach for CMS's sixth-grade softball team or as a representative of CMS or CCSBE [*Id.* ¶ 6].

Rogers was present in juvenile court on December 12, 2019, for J.B.'s court date because of his position as a YSO [*Id.* ¶ 5]. However, B.G. and J.G. were both unclear as to Rogers's role in relation to the court system [Doc. 37-3, p. 12; Doc. 37-9, p. 7]. B.G. believed that Rogers was present at the court as a representative of CMS [Doc. 37-3, p. 12] while J.G. believed Rogers may have been a liaison between CMS and the court [Doc. 37-9, p. 7]. B.G.

14

and J.G. stated that after they had informed the District Attorney about not hearing from CMS about the incidents, Rogers stepped in, stating he would make a phone call [Doc. 37-3, p. 12; Doc. 37-9, p. 7]. J.G. stated that Rogers left to make a phone call, which he presumed to be to CMS, and then Rogers returned, stating that he had informed CMS about the lack of contact [Doc. 37-9, p. 7]. Rogers stated that he does not recall having a conversation about J.B.'s case with A.T., B.G., J.G., or anyone at CMS or CCSBE [Doc. 37-21 ¶ 9].

According to Dr. Russell Dyer, Director of Schools, and Dr. Leneda Laing, CMS Principal in 2019, neither CMS nor CCSBE representatives have access to juvenile court records nor do their duties include participating in or overseeing juvenile court cases [Doc. 37-12 ¶ 3; Doc. 37-13 ¶¶ 3–4]. Furthermore, no representative from CMS or CCSBE was notified of J.B.'s court dates, was summoned for J.B.'s court dates, or was otherwise made aware of the outcome of any of J.B.'s hearings [Doc. 37-12 ¶ 3; Doc. 37-13 ¶ 4].

### 7. Raider Blue Academy

When J.B. returned to CMS, he was placed in RBA, akin to an alternative school, and was not allowed to be in classes with the general student population [Doc. 37-4 ¶ 8]. J.B. remained in RBA until the week before spring break in 2020 at which point he had earned enough points to participate in a homeroom with the general student population [*Id.* ¶ 9]. J.B. was not allowed to be in a homeroom class on the same hallway as A.T., and therefore, he was assigned to a homeroom class on a different hallway [*Id.*]. Additionally, J.B. was escorted to and from his homeroom class by RBA staff to ensure he did not enter the hallway where A.T.'s homeroom was located [*Id.*]. After spring break, the students did not return to school for the remainder of the 2019-2020 school year due to the COVID-19 pandemic [*Id.*].

15

## 8. Class Assignment

On July 14, 2020, B.G. submitted a "Returning Student Registration" form prior to A.T. entering seventh grade [Doc. 37-22; Doc. 37-3, pp. 16–17]. Under the section of the form labeled "Required Documents Page," one of the categories of required documents is parenting plans/custody papers, or other court documents, if applicable [Doc. 37-22, pp. 6–7; Doc. 37-3, p. 17]. As her method of providing required documents, B.G. selected the option that she would "Upload Some or All Documents Online" [Doc. 37-22, p. 7; Doc. 37-3, p. 17]. B.G. did not upload any documents in the required category of parenting plans/custody papers, or court documents, including the Mutual No Contact Order [*Id.*].

In October 2020, when the second quarter of the seventh-grade year began, A.T. walked into an assigned class and realized that J.B. had been placed in the same class [Doc. 37-1, p. 14; Doc. 37-13 ¶ 5]. A.T. left the classroom immediately and went to the office of the seventh-grade principal, Ingram, where she called J.G. [Doc. 37-1, pp. 14–15; Doc. 37-9, p. 12]. A.T. informed J.G. that she had been placed in the same class as J.B., and J.G. asked to speak with Ingram [Doc. 37-9, p. 12]. Ingram told J.G. that he was unaware that a Mutual No Contact Order existed between A.T. and J.B., and he asked J.G. to send the Order to him [Doc. 37-9, p. 12; Doc. 37-17 ¶ 4]. J.G. emailed the Order to Ingram [Doc. 37-9, p. 12; Doc. 37-17 ¶ 4]. Prior to J.G. emailing the Order to Ingram, no one at CMS or CCSBE was aware of the Mutual No Contact Order [Doc. 37-4 ¶ 11; Doc. 37-12 ¶ 4; Doc. 37-13 ¶ 6; Doc. 37-14 ¶ 5; Doc. 37-15 ¶ 5; Doc. 37-16 ¶ 3; Doc. 37-17 ¶ 4; Doc. 37-1, p. 22; Doc. 37-3, pp. 7–8; Doc. 37-9, pp. 11–12].

After Ingram was sent the Order, Ingram asked J.G. how he wanted the issue of A.T. and J.B. being placed in the same class handled [Doc. 37-9, p. 13]. J.G. told Ingram to ask

A.T. how she wanted the issue handled, and A.T. chose to switch classes [*Id.*; Doc. 37-1, p. 15; Doc. 37-3, p. 13; *see* Doc. 37-23 (showing Business Communications was dropped from A.T.'s schedule, and Leadership class was added on the same day)].

For the brief time A.T. and J.B. were in the same classroom together, they did not speak to one another, and J.B. did not touch A.T. [Doc. 37-1, pp. 15–16]. J.B. did not commit another sexual assault or battery against A.T. at any other time during her seventh-grade year at CMS [*Id.* at 16].

According to Laing, class assignments at CMS are completed automatically by a computer [Doc. 37-13 ¶ 7]. If CMS or CCSBE had notice of the Order, the Order would have been uploaded to CMS's computer system and prevented A.T. and J.B. from being electronically assigned to the same class together, so long as the Order was still active [*Id.* ¶ 8].

### 9. Seventh Grade Assembly

According to Ingram, as the seventh-grade assistant principal for CMS, he would regularly hold assemblies for seventh graders in the spring [Doc. 37-17 ¶ 5]. These assemblies focused on students keeping their hands to themselves in relation to horseplay [*Id.*]. In April 2021, Ingram virtually held such an assembly for the seventh graders of CMS [*Id.*; Doc. 37-1, pp. 16–17].[4] Ingram stated that this assembly was not focused on sexual assault or battery, but A.T. stated that Ingram discussed sexual harassment during the assembly [Doc. 37-17 ¶ 5; Doc. 37-1, p. 17]. Specifically, A.T. stated that Ingram told students that if you look at somebody the wrong way these days, you may get sued [Doc. 37-1, pp. 17–18, 25]. A.T. further stated that Ingram told the students that if they reported to Ingram about "what happened (touching

---

[4] While the assembly was conducted over Zoom, students were physically present in CMS at the time of the assembly [Doc. 37-1, pp. 16–17].

wise), he'd have to report it" to the SRO [Doc. 41-9, p. 2; *see* Doc. 37-3, p. 14]. A.T. expressed that this statement "made me not want to tell him anything at all" [Doc. 41-9, p. 2]. A.T. believed the assembly was directed towards her and her lawsuit, and that Ingram was belittling the incident between her and J.B. as he made a reference to a "pat on the bottom" [Doc. 37-1, p. 17; Doc. 37-3, p. 14]. Additionally, A.T. stated that this type of assembly was not held annually with seventh graders, though she stated this was her opinion rather than personal knowledge [Doc. 37-1, p. 18].

Ingram stated that he did not reference A.T.'s lawsuit during the assembly nor was he trying to "poke fun" at A.T. or any other student [Doc. 37-17 ¶ 6]. Further, Ingram stated that he did not know which students were in attendance the day of the virtual assembly nor does he know the specifics of any sexual assault, battery, or harassment that any of the students watching the assembly may have experienced during their lives [*Id.*].

A.T. stated that when students were let out after the assembly, student were tagging each other and saying "sexual harassment, sexual assault" [Doc. 37-1, pp. 25, 28]. The students' conduct was on their own accord and not at the direction of Ingram or any other teacher [*Id.* at 28].

### 10.    CMS Handbook & CCSBE Policies and Training

CMS's 2019-2020 and 2020-2021 handbooks contained a Non-Discrimination/Harassment Policy [Doc. 37-24]. As part of the "Returning Student Registration" forms B.G. filled out each year for A.T. while she was attending CMS, B.G. agreed that she had read and understood the handbook [Doc. 37-2, p. 6; Doc. 37-22, p. 6]. In 2019, CCSBE Policy 6.304 "Student Discrimination, Harassment, Bullying, Cyberbullying, and Intimidation" and CCBSE Policy 6.305 "Students Concerns, Complaints, and Grievances"

18

were both in place at CMS [Doc. 37-25; Doc. 37-12 ¶ 5]. On October 12, 2020, CCSBE Policy 6.3041 "Title IX and Sexual Harassment" was issued following the changes in federal law [Doc. 37-26; Doc. 37-12 ¶ 8].

All CCSBE employees, including support staff, undergo yearly, state-mandated Title IX training, which is provided during their annual in-service training [Doc. 37-12 ¶ 6]. In addition to the in-service training, Title IX Coordinator Doug Moore provides all new Cleveland City Schools employees Title IX training [*Id.* ¶ 7]. Due to legal changes, special Title IX training for CCSBE employees occurred on November 3, 2020 [*Id.* ¶ 8].

## II. Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party. *McLean v. 988011 Ont., Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). As such, the moving party has the initial burden of informing the court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks,* 344 F.3d 587, 595 (6th Cir. 2003). The moving party can satisfy this burden by presenting affirmative evidence that negates an element of the nonmoving party's claim or by demonstrating an absence of evidence to support the nonmoving party's case. *Id.*

To successfully oppose a motion for summary judgment, "[t]he non-moving party . . . must present sufficient evidence from which a jury could reasonably find for him." *Jones v. Muskegon Cnty.*, 625 F.3d 935, 940 (6th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A party opposing a Rule 56 motion has the duty to

19

affirmatively present and point out *specific evidence in the record* sufficient to justify a jury decision in her favor. *See* Fed. R. Civ. P. 56(c)(1); *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989); *Anderson*, 477 U.S. at 256. The nonmoving party cannot simply rely on the mere allegations or denials contained in the party's pleadings. *Anderson*, 477 U.S. at 256. And merely alleging that a factual dispute exists cannot defeat a properly supported motion for summary judgment. *Id.* Further, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248; *accord McLemore v. Gumucio*, 619 F. Supp. 3d 816, 823 (M.D. Tenn. 2021).

## III.    Analysis[5]

### A.    Cleveland Middle School as a Party

As an initial matter, CMS and CCSBE argue that CMS should be dismissed from this suit because, as an individual school, CMS is not an entity capable of being sued, but rather, CCSBE is the proper party [Doc. 39, pp. 13–14]. Plaintiffs agree that CMS should be dismissed as a party [Doc. 41, p. 5].

---

[5] Defendants argue that plaintiffs have effectively abandoned all their claims aside from the allegation that CCSBE violated Title IX [Doc. 44, pp. 18–20]. While "a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment[,]" *Brown v. VHS of Mich. Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013), the Sixth Circuit has also maintained that a district court "[may] not use that [failure] as a reason for granting summary judgment without first examining all the materials properly before it under Rule 56(c)." *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 630 (6th Cir. 2014)). Accordingly, the Court will not deem plaintiffs' claims abandoned without first determining whether defendants have established that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. *See id.*

In light of the parties' agreement, defendants' motion [Doc. 37] is **GRANTED in part** to the extent that all claims against CMS are hereby **DISMISSED**.

### B.      Title IX – CCSBE

Title IX of the Education Amendments Act of 1972 ("Title IX") states, in pertinent part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied to the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . .

20 U.S.C. § 1681(a).  "Title IX supports lawsuits brought for certain injuries caused by entities that receive federal educations funds" as "schools consent to permit themselves to be subject to Title IX liability when accepting federal funds."  *Doe v. Hamilton Cnty. Bd. of Educ.*, 329 F. Supp. 3d 543, 555 (E.D. Tenn. 2018) (hereinafter "*Hamilton*"); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286–87 (1998)).  The Supreme Court held in *Davis v. Monroe County Board of Education* that federal funding recipients may be liable under Title IX for deliberate indifference to student-on-student sexual harassment "in certain limited circumstances."  526 U.S. 629, 643 (1999).

To establish a *prima facie* case of student-on-student sexual harassment, plaintiffs must show: "(1) sexual harassment so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school, (2) the funding recipient had actual knowledge of the sexual harassment, and (3) the funding recipient was deliberately indifferent to the harassment."  *Stiles ex rel. D.S. v. Grainger Cnty.*, 819 F.3d 834, 848 (6th Cir. 2016) (citing *Davis*, 526 U.S. at 650).  This three-element test "clearly has two separate components, comprising separate-but-related torts by separate-and-*un*related tortfeasors: (1) 'actionable harassment' by a student; and (2) a

21

deliberate-indifference intentional tort by the school." *Kollaritsch*, 944 F.3d at 619–20 (emphasis in original) (internal citations omitted). As most relevant here, this formulation "requires that the school had actual knowledge of some actionable sexual harassment and that the school's deliberate indifference to it resulted in further actionable harassment of the student-victim." *Id.* at 620.

### i.      Actionable Sexual Harassment

"Harassment" is defined as "some type of aggressive and antagonistic behavior that, from the victim's perspective, is uninvited, unwanted, and non-consensual." *Id*. Furthermore, for sexual harassment to be actionable, it must be severe, pervasive, and objectively offensive. *Id.* "Severe" entails something more than just "juvenile behavior among students, even behavior that is antagonistic, non-consensual, and crass" such as teasing or name-calling. *Id.* "Pervasive" means "widespread" or "systemic," necessitating multiple incidents of harassment. *Id.* (stating "one incident of harassment is not enough"). Lastly, "objectively offensive" refers to "behavior that would be offensive to a reasonable person under the circumstances, not merely offensive to the victim, personally or subjectively." *Id.* at 621.

### ii.     Deliberate-Indifference Intentional Tort

To establish the second component, a plaintiff must plead "and prove four elements of a deliberate-indifference-based intentional tort: (1) knowledge, (2) an act, (3) injury, and (4) causation." *Id*. Defendants contend that plaintiffs cannot prove each of these necessary elements [Doc. 39, p. 21].

### 1.      Actual Knowledge

"'Knowledge' means that the defendant school had 'actual knowledge' of an incident of actionable sexual harassment that prompted or should have promoted a response."

*Kollaritsch*, 944 F.3d at 621; *see also Winzer v. Sch. Dist. for Pontiac*, 105 F. App'x 679, 681 (6th Cir. 2004) (holding that the Sixth Circuit declines to adopt a "constructive-knowledge standard" under Title IX); *Kollaritsch*, 944 F.3d at 621 (stating that the first element of the deliberate-indifference-based intentional tort is knowledge). When an "appropriate person" at a school knows about the sexual harassment, the school has "actual knowledge." *See Dahmer v. W. Ky. Univ.*, No. 21-5318, 2022 WL 19296342, at *2 (6th Cir. Oct. 13, 2022); *Hamilton*, 329 F. Supp. 3d at 564–65. "An 'appropriate person' . . . is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination" or harassment. *Gebser*, 524 U.S. at 290. Thus, "a school agent with the authority to discipline students and prevent and correct known harassment is an 'appropriate person' whose knowledge can be imputed" to the department or school. *Hamilton*, 329 F. Supp. 3d at 565.

### 2. An Act

After proving actual knowledge, the plaintiff must prove the element of an act. "An '[a]ct' means a response by the school that was 'clearly unreasonable in light of the known circumstances[]' . . . thus demonstrating the school's deliberate indifference to the foreseeability possibility of *further* actionable harassment of the victim." *Kollaritsch*, 944 F.3d at 621 (emphasis in original) (citing *Davis*, 526 U.S. at 643, 648).

### 3. Injury

An "injury" in the Title IX context means the "deprivation of access to the educational opportunities or benefits provided by the school." *Id.* at 622 (citing *Davis*, 526 U.S. at 650). "Emotional harm standing alone is not a redressable Title IX injury." *Id.*

### 4. Causation

Lastly, "causation" means the "act" caused the "injury," "such that the injury is attributable to the post-actual-knowledge *further* harassment, which would not have happened but for the clear unreasonableness of the school's response." *Id.* (emphasis in original) (citing *Davis*, 526 U.S. at 644). Further actionable sexual harassment after the funding recipient's response is needed to be "pervasive" and meet the causation element. *Id.* at 618. However, further harassment by itself it is not enough; the unreasonableness of the school's response must have caused the further harassment. *Id.* at 622; *see Stiles*, 819 F.3d at 834. "But the critical point is that the response must bring about or fail to protect against the further harassment." *Kollaritsch*, 944 F.3d at 622.

Under *Kollaritsch*, which dealt with a Title IX claim in the context of universities, it was required that the further harassment "be inflicted against the same victim." *Id.* at 621–22. "[T]he plaintiff 'cannot . . . premise the [further harassment] element of her Title IX claim on conduct [by the perpetrator] directed at third parties.'" *Id.* at 622 (quoting *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 363 (6th Cir. 2012)). However, in *Doe ex rel. Doe #2 v. Metro. Gov't of Nashville & Davidson Cnty.*, 35 F.4th 459, 464–68 (6th Cir. 2022) (hereinafter "*Doe #2*"), the Sixth Circuit eliminated *Kollaritsch*'s same victim requirement to meet the element of further harassment in high school Title IX claims given high schools exercise greater control over their students than universities.

#### a. Single-Incident Title IX Claims

Plaintiffs argue that under *Doe #2*, a secondary or subsequent assault or instance of harassment is not required to establish defendants' deliberate indifference and liability under Title IX [Doc. 41, p. 13]. Rather, plaintiffs argue, so long as the response to the sexual assault

24

by the school was deliberately indifferent, a Title IX claim can be made [*Id.*].  Plaintiffs also cite to *M.D. ex rel. Deweese v. Bowling Green Indep. Sch. Dist.*, 709 F. App'x 775 (6th Cir. 2017) (hereinafter "*Deweese*") and *H.M.T. v. Metro. Gov't of Nashville and Davidson Cnty.*, No. 3:22-cv-402, 2023 WL 2287635 (M.D. Tenn. Feb. 28, 2023) (hereinafter "*H.M.T.*") in support of their single-incident standard [*Id.*].

The Court finds plaintiffs' argument of a new standard of single-incident Title IX claims to be unpersuasive.  First, plaintiffs premise this "new standard" by relying on the Sixth Circuit's statement in *Doe #2* that "[d]ue to varying degrees of oversight that these two kinds of institutions [i.e., universities and high schools] exercise over their students, the distinction between a university and a high school makes a difference for the purpose of a student-on-student harassment claim under Title IX" [Doc. 41, p. 13 (citing *Doe #2*, 35 F.4th at 467)].  Plaintiffs contend that this statement indicates an openness to applying Title IX liability in a high school setting even when no new harassment occurred [*Id.*].  As stated previously, however, the *Doe #2* court differentiated between universities and high schools in ultimately declining to extend *Kollaritsch*'s *same-victim requirement* to a Title IX claim in a high school setting.  35 F.4th at 467–68.  The Sixth Circuit did not express such an openness to eliminating the requirement of *multiple incidents of harassment* as the plaintiffs suggest.  *Id.* at 466 ("[I]n a successful 'before' claim, a school's deliberate indifference to known *past acts* of sexual misconduct must have caused the misconduct the student alleges[,]" and noting that under the plaintiffs' "after" theory, one plaintiff "continued to suffer further harassment everyday at school").

Second, plaintiffs misinterpret the holding in *Deweese*.  In *Deweese*, the court held that there was no deliberate indifference because the school's response was not clearly

unreasonable in light of the known circumstances. 709 F. App'x at 777–78. While the court did not base its judgment per se on the plaintiff's assertion, or lack thereof, of further actionable harassment, the court did not need to. No further actionable harassment could have resulted from the school's deliberate indifference because there was no deliberate indifference. *Deweese*, 709 F. App'x at 777–78. Therefore, the court did not need to reach the issue of further actionable harassment after it had determined that no deliberate indifference had occurred. As to plaintiffs' argument here that *H.M.T.* did not deny the validity of a claim that no further harassment was needed to make a *Davis* claim, the Court does not find this convincing. Like the court in *Deweese*, the court in *H.M.T.* held that the plaintiff's Title IX claim failed as a matter of law because the school's response was not clearly unreasonable in light of the circumstances. 2023 WL 2287635, at *3. The *H.M.T.* court did not implicitly accept the validity of a single-incident claim because the court "ignored the question of additional harassment" [Doc. 41, p. 13]. Again, the *H.M.T.* court did not *need* to reach the issue of further actionable harassment because no deliberate indifference was found in the school's response.

### iii. Plaintiffs Have Not Shown Further Actionable Sexual Harassment

For the reasons above, the showing of further actionable sexual harassment is required to prove a *prima facie* case of Title IX. *See Kollaritsch*, 944 F.3d at 618, 622. Thus, the Court turns to plaintiffs' arguments of further harassment.

Plaintiffs contend that A.T.'s placement in a class with J.B. in October 2020 is sufficient to constitute a subsequent harassment [Doc. 41, p. 9]. In doing so, plaintiffs attempt to distinguish their case from *Kollaritsch* [*Id.*]. In *Kollaritsch*, the court found that one plaintiff did not assert further actionable sexual harassment as she had only stated that she regularly

26

encountered her assailant in the public areas of the dormitory or the cafeteria, without anything more to suggest the encounters were sexual or that they were severe, pervasive, and objectively unreasonable. 944 F.3d at 624–25. Plaintiffs argue that unlike college students, minor children cannot voluntarily leave classrooms, and therefore, A.T. stood the risk of being forced to sit in the presence of her assailant when she and J.B. were in the same classroom together [*Id.*].

First, while plaintiffs argue that A.T. was at risk of being made to sit with her assailant in the same room, when A.T. realized that J.B. was in the same classroom as her, she was able to immediately leave the room and go to Ingram's office to call her stepfather. A.T. states that no physical contact occurred between her and J.B., nor did the two even speak with one another. Second, while certainly inopportune, plaintiffs fail to show how A.T. and J.B being in the same classroom as each other for a matter of moments constitutes actionable sexual harassment under applicable jurisprudence. As stated previously, harassment under Title IX is defined as "some type of aggressive and antagonistic behavior that, from the victim's perspective, is uninvited, unwanted, and non-consensual." *Kollaritsch*, 944 F.3d at 620. Furthermore, for sexual harassment to be actionable, it must be severe, pervasive, and objectively offensive. *Id.*

An assailant being in the mere presence of a victim does not constitute actionable harassment. *See Doe v. Univ. of Ky.*, 959 F.3d 246, 251–52 (6th Cir. 2020) (finding that the plaintiff's allegations that assailant stared at her during their shared classes, stood by her at a party, followed her home, and sat near her at the library do not constitute sexual harassment let alone sexual harassment that is severe, pervasive, and objectively offensive); *Doe v. Plymouth-Canton Cmty. Schs.*, No. 19-10166, 2022 WL 1913074, at *7 (E.D. Mich. June 3, 2022) (finding the plaintiff's encounters with the assailant in the high school hallways did not

27

constitute actionable harassment under Title IX because they were not sex-based or sexual harassment). Therefore, plaintiffs' claim that further actionable harassment occurred due to A.T.'s limited placement in the same classroom as J.B. fails.[6]

Plaintiffs also contend that A.T. was subject to harassment during the virtual assembly held by Ingram in April 2021 [Doc. 41, pp. 13–15]. Specifically, plaintiffs claim that Ingram made statements trivializing the subject matter of sexual harassment and assault, and in doing so, Ingram created and subjected A.T. to a hostile environment [*Id.*]. Defendants dispute whether Ingram made these statements, but if he did, Ingram did not know who was in attendance on the day of his assembly nor did he know the specifics of any sexual assault or harassment that any of the students might have experienced [Doc. 44, pp. 15–16]. While the plaintiffs allege that Ingram's assembly amounted to harassment, plaintiffs do not produce any evidence that the harassment was severe, pervasive, and objectively reasonable, and in turn, actionable. In fact, plaintiffs' statement that the assembly was harassment is couched in plaintiffs' argument that the same assembly was evidence of defendants' deliberate indifference to the sexual harassment endured by A.T. [Doc. 41, pp. 13–15].

Even if plaintiffs were arguing that the assembly was harassment, and moreover *further* harassment, this argument would fail as relevant jurisprudence leads to the conclusion that the assembly was not severe, pervasive, and objectively offensive. *Cf. Chisholm v. St. Mary's City Sch. Dist. Bd. of Educ.*, 947 F.3d 342, 350 (6th Cir. 2020) (stating "crude or vulgar language

---

[6] Additionally, plaintiffs provide no evidence that further actionable harassment occurred to other students after CCSBE gained actual knowledge of A.T.'s sexual assault. *See Doe #2*, 35 F.4th at 468 (declining to extend *Kollaritsch*'s same-victim requirement to a Title IX "after" claim in a high school setting).

28

alone does rise to the level of a Title IX violation" and "Title IX . . . is not a 'general civility code'"); *Jones v. Univ. of Detroit Mercy*, 527 F. Supp. 3d 945, 948 (E.D. Mich. 2021) (finding that the school basketball coach's comment telling the plaintiff to engage in a sexual act while making a lewd gesture with his crotch was not severe enough to constitute actionable sexual harassment under Title IX). Assuming that Ingram made the statements alleged by the plaintiffs, these statements, while they could be viewed as seemingly inappropriate or insensitive, they do not rise to the level of a Title IX violation. The statements alleged are generalized—e.g., plaintiffs allege that Ingram stated "sexual assault usually occurs when students 'horseplay'"—and were not directed at any student in particular; rather, Ingram was addressing the seventh-grade student body at large. *See Plymouth-Canton Cmty. Schs.*, 2022 WL 1913074, at *8 (citing *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir. 2011) (stating that the "Fifth Circuit determined that because the student who made the comment 'did not even make the comment to [the plaintiff] directly[,]' the disparaging comment 'by no means qualifies as harassment at all"). In total, the virtual assembly held by Ingram in April 2021 does not constitute further actionable harassment.

As plaintiffs have not alleged any further actionable sexual harassment, plaintiffs cannot meet the requirements of a *prima facie* Title IX claim.

### iv. Noncompliance with Title IX Regulations and Procedures

Plaintiffs also argue that defendants "are liable for per se violations of Title IX because they did not offer any supportive measures to Plaintiff A.T. subsequent to her assaults as required by law" [Doc. 41, p. 15]. Defendants argue that noncompliance with Title IX

regulations and procedures does not, by itself, establish deliberate indifference [Doc. 44, p. 18].[7]

"[A]lleged failure to comply with Title IX regulations, promulgated by the United States Department of Education[] does not confer a private right of action." *Doe v. Univ. of the S.*, 687 F. Supp. 2d 744, 758 (E.D. Tenn. 2009). "Although the U.S. Department of Education and other '[a]gencies generally have authority to promulgate and enforce requirements that effectuate the statute's non-discrimination mandate,' the 'implied right of action under Title IX' does not provide for the 'recovery of damages in violation of those sorts of administrative requirements.'" *Id.* (citing *Gebser*, 524 U.S. at 291–92). Therefore, plaintiffs' argument regarding Title IX noncompliance must fail.

Even if the Court were to assume plaintiffs' argument was one of deliberate indifference, this argument would also fail. "Noncompliance with Title IX regulations and procedures does not, by itself, establish deliberate indifference or a funding recipient's official decision not to remedy sex-based harassment." *Plymouth-Canton Cmty. Schs.*, 2022 WL 1913074, at *12 (citing *Gebser*, 524 U.S. at 291–92); *accord Doe v. Univ. of Ky.*, 959 F.3d at 252 (holding that the university's "non-compliance with its own administrative policies" did not "amount to deliberate indifference"); *Irvin v. Grand Rapids Pub. Schs.*, 366 F. Supp. 3d 908, 921 (W.D. Mich. 2016) (finding that the defendants' failure to comply with Title IX regulations, "specifically their lack of conducting an independent investigation after [the

_____

[7] Although defendants categorize plaintiffs' argument of Title IX noncompliance as a deliberate indifference argument, the plaintiffs do not. Nowhere in plaintiffs' argument about Title IX noncompliance do they suggest that it supports a finding of deliberate indifference. Rather, plaintiffs assert that failing to render support measures to A.T. was a per se violation of Title IX [Doc. 41, p. 15].

Case 1:22-cv-00110-TAV-SKL   Document 62   Filed 09/27/24   Page 30 of 52   PageID #: 783

assailant] was removed, also fails to establish deliberate indifference"). Therefore, defendants' noncompliance with Title IX regulations, without more, does not amount to deliberate indifference. Regardless, even if noncompliance with Title IX regulations did amount to deliberate indifference, the Court has already found plaintiffs have not demonstrated further actionable harassment as required to prove a *prima facie* case of a Title IX claim.

Accordingly, for all the reasons set forth above, defendants' motion [Doc. 37] is **GRANTED** as to plaintiffs' Title IX claim against CCSBE.

### C. Title IX Retaliation – CCSBE

The Supreme Court has held that the implied right of action under Title IX includes retaliation claims, such that "when a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex' in violation of Title IX." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005) (emphasis in original). Although the Supreme Court in *Jackson* did not spell out the elements of a Title IX retaliation claim, such claims have been analogized to Title VII retaliation claims. *Bose v. Bea*, 947 F.3d 983, 988 (6th Cir. 2020). Thus, to establish a *prima facie* case of Title IX retaliation, a plaintiff must show that "(1) [s]he engaged in protected activity, (2) [the funding recipient] knew of the protected activity, (3) [s]he suffered an adverse school-related action, and (4) a causal connection exists between the protected activity and the adverse action." *Id.* (citing *Gordon v. Traverse City Area Pub. Schs.*, 686 F. App'x 315, 320 (6th Cir. 2017)).

Defendants argue that plaintiffs cannot establish a *prima facie* case of Title IX retaliation [Doc. 39, pp. 25–29]. Specifically, defendants contend that CCSBE took no adverse educational actions against A.T., nor have any been alleged [*Id.* at 25]. First, defendants state

that plaintiffs' allegations that CCSBE and its employees ignored and refused to investigate the incident between A.T. and J.B. are unfounded [*Id.* at 26]. Additionally, to the extent plaintiffs allege that the computerized placement of A.T. and J.B. in the same class constitutes an adverse educational action, defendants contend that they were not aware of the Mutual No Contact Order until after the Order was sent by J.G. in October 2020 [*Id.* at 27]. Further, defendants argue that the alleged failure of CCSBE to contact A.T.'s parents about the incident between A.T. and J.B. cannot be construed as an adverse educational action [*Id.* at 28]. Lastly, defendants argue that plaintiffs' claims that CCSBE discouraged those with actual information of sexual assaults from reporting does not qualify as an adverse educational action against A.T. [*Id.* at 27]. Plaintiffs do not respond to defendants' arguments.

As a threshold matter, plaintiffs engaged in a protected activity through participating in the investigation after O.M. reported A.T.'s sexual assault, thereby actively opposing the alleged discrimination. *See Doe v. Belmont Univ.*, 367 F. Supp. 3d 732, 756–57 (M.D. Tenn. 2019) (stating that the "protected activity" that forms the basis of a Title IX retaliation claim is "actively complaining of or opposing alleged discrimination on the basis of sex under Title IX"). Furthermore, it is undisputed that CCSBE knew of this protected activity.

Turning to the third element, "[t]o qualify as 'adverse,' an educational action must be sufficiently severe to dissuade a 'reasonable person' from engaging in the protected activity." *Gordon*, 686 F. App'x at 320 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 728–29 (7th Cir. 2009)); *see also Irvin*, 366 F. Supp. 3d at 922 (stating "[t]he term 'adverse action' is drawn from the employment case law; examples in that context include discharge, demotion, refusal to hire, nonrenewal of contracts, and failure to promote") (quoting *Thaddeus-X v. Blatter*, 175 F.3d

32

378, 396 (6th Cir. 1999)).   A plaintiff can meet their burden of showing an adverse school-related action by demonstrating that the defendant's actions either individually or in combination would dissuade a reasonable person from engaging in the protected activity.  *Doe v. Univ. of Ky.*, No. 22-6012, 2024 WL 3688446, at *7 (6th Cir. Aug. 7, 2024) (citing *Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558, 569–70 (6th Cir. 2019)).

Here, plaintiffs first claim that CCSBE officials discouraged those with actual information of sexual assault from reporting to appropriate authorities [Doc. 21 ¶ 81]. However, plaintiffs' claim does not relate to an adverse school action that plaintiffs themselves suffered; rather, plaintiffs claim in broad strokes that CCSBE took an alleged adverse action against "those with actual information of sexual assault" [*Id.*].  This claim cannot stand to establish the third element of a *prima facie* case of Title IX retaliation.  *See Bose*, 947 F.3d at 988 (stating that the third element of a *prima facie* case of Title IX retaliation is that the plaintiff must show that *she* suffered an adverse educational action).

Second, plaintiffs assert that CCSBE officials failed to report the sexual assaults to A.T.'s parents [Doc. 21 ¶ 83].  Plaintiffs, however, provide no argument that the failure to call a student's parents to report a sexual assault is sufficiently severe to dissuade a reasonable person from engaging in the protected activity, e.g. reporting allegations of sexual assault or otherwise opposing sex discrimination.  *See Muskegon Cnty.*, 625 F.3d at 940 (citing *Anderson*, 477 U.S. 242, 252 (1986) ("The non-moving party . . . must present sufficient evidence from which a jury could reasonably find for him.")  Plaintiffs accordingly suffered no adverse educational action through CCSBE's alleged failure to report the sexual assault to A.T.'s parents.

33

Further, plaintiffs' claim that once law enforcement became involved, CCSBE ignored the incident between A.T. and J.B., feigned as though the assault never happened, and refused to investigate the matter or otherwise comply with Title IX is not supported by the facts in this case, even viewing them in the light most favorable to the plaintiffs [Doc. 21 ¶ 82]. The record reflects that even after law enforcement became involved and arrested J.B., CCSBE officials, particularly Pirkle, continued disciplinary measures against J.B. Specifically, once J.B. returned from juvenile detention, he was placed in the alternative school located in CMS and separated from the general school population and A.T. in particular. Even when J.B. earned enough credits to be in a homeroom class with the general school population, J.B. was assigned to a homeroom in a different hallway than A.T., and RBA staff accompanied J.B. to and from class to ensure he did not enter any other hallways at CMS.

While defendants discuss the computerized placement of J.B. and A.T. in the same classroom in October 2020 and the virtual assembly in April 2021 in the context of "adverse school-related action," plaintiffs have not alleged these actions to be adverse educational actions resulting in Title IX retaliation.

However, to the extent that the computerized placement of A.T. and J.B. in the same classroom can be construed as CCSBE "ignor[ing] the matter" or "feigning as though the assault never happened" under plaintiffs' complaint [*Id.*], the Court does not find that the placement constitutes adverse educational action. First, the action of the placement was done by a computerized system and not by any affirmative action of a CCSBE official. Second, no CCSBE official or employee was aware that a Mutual No Contact Order was in place between A.T. and J.B., which would have prevented the placement of them in the same class. Regardless, however, of whether the placement was an action or inaction, once the placement

34

was brought to the attention of CCSBE employees, the situation was promptly remedied, and therefore, it does not rise to the level of an adverse action for Title IX retaliation purposes. *See Kessling v. Ohio*, No. 2:20-CV-1719, 2022 WL 17092250, at *6 (S.D. Ohio Nov. 21, 2022) (citing *Scott v. Metropolitan Health Corp.*, 234 F. App'x 341, 348 (6th Cir. 2007)) (stating that "actions that are not implemented or are immediately rescinded are not" adverse actions).

Furthermore, plaintiffs have not alleged nor shown a causal connection, the fourth element to establish a *prima facie* case, between the protected activity of participating in the opposition of sex discrimination and the class placement. The class placement occurred over a year after the report of A.T.'s assault, and therefore, any inference of temporal proximity would be extinguished. *See Belmont Univ.*, 367 F. Supp. 3d at 760 (stating that "in certain circumstances, temporal proximity between events can be close enough in time to constitute sufficient evidence of a causal connection for the purposes of the *prima facie* retaliation case," but "the timeline of events can also extinguish any inference based on temporal proximity") (citing *Montell v. Diversified Clinical Servs.*, 757 F.3d 497, 505–06 (6th Cir. 2014); *Wasek v. Arrow Energy Servs.*, 682 F.3d 463, 472 (6th Cir. 2012)).

Regarding the virtual assembly, not only do plaintiffs fail to establish it is an adverse educational action, as necessary for their *prima facie* case, but the assembly cannot be understood to be within the plaintiffs' claim of Title IX retaliation in their complaint. Specifically, the virtual assembly cannot be construed as CCSBE ignoring the incident, feigning as though it never happened, refusing to investigate, or not taking steps to remedy the harassment [*See* Doc. 21 ¶ 82]. Even if alleged to be an adverse educational action, this claim would fail. First, the assembly was conducted for the entire seventh-grade student population at CMS and was not an individualized action against the plaintiffs as typically seen in other

35

Title IX retaliation claims. *See Gordon*, 686 F. App'x at 321 (finding the plaintiff supported his *prima facie* case with adverse educational actions including his two suspensions, his in-class punishment, and the school's denial of his opportunity to take creative writing); *Doe v. University of Tennessee*, 186 F. Supp. 3d 788, 811 (M.D. Tenn. 2016) (finding the plaintiff's claim that she was told that "her return to her athletic team was conditioned on her willingness to segregate herself from other team members" was clearly a punitive measure and sufficient to support a Title IX retaliation claim).

Furthermore, even assuming the facts in the light most favorable to the plaintiffs, "[a] recipient of federal funds may be liable in damages under Title IX only for its *own* conduct, therefore a plaintiff cannot use agency principles to impute liability to [a school] for the misconduct of its teachers." *K.G. ex rel. Doe v. Bd. of Educ. of Woodford Cnty.*, No. 5:18-cv_555, 2022 WL 19692050, at *12 (E.D. Ky. Jan. 19, 2022) (internal quotation marks omitted) (emphasis added) (quoting Davis, 526 U.S. at 640). And thus, an action by a teacher "cannot qualify as an adverse action for purposes of a retaliation claim." *Id.* (citation omitted) (finding that the defendant Board of Education could not be held liable for the retaliation of a guidance counselor under an agency theory); *see Deweese*, 709 F. App'x at 779 (rejecting the plaintiffs' arguments that the school district could be liable for the coach's actions on an agency theory). Therefore, Ingram's actions at the assembly cannot be an adverse action.

Even if CCSBE could be liable for Ingram's misconduct, Ingram's statement to the seventh-grade class that if they reported sexual harassment to him, he would report it to the SRO, would not be sufficiently severe to dissuade a reasonable person from reporting. Ingram's statement was specific to reporting sexual assault or harassment to him and how Ingram specifically would handle the report, i.e., relaying it to the SRO. While perhaps this

36

could dissuade a student or a reasonable person from reporting to Ingram himself, it is not sufficiently severe to dissuade students from reporting in general as there is nothing in the record to indicate that students were restricted from reporting sexual assault or harassment to any other CCSBE official or employee. Additionally, per CMS's student handbook and its Non-Discrimination/Harassment Policy, students who felt they had been discriminated against or harassed on the basis of their sex could file a grievance using a "Grievance Form" located in the school office [Doc. 37-24, p. 2]. Thus, CMS students were not even required to report via a CCSBE official or employee. In consideration of the above, it cannot be said that the assembly was an adverse educational action. *See also Gordon*, 686 F. App'x at 321 (finding no adverse educational action where (1) the plaintiff's disciplinary record was summarized in an internal school memo; (2) the defendant took steps to help the plaintiff with schoolwork, even though the plaintiff described his assigned tutor as his "chief antagonist[;]" and (3) the defendant gave the plaintiff the option to stay home after his assault); *Lipian v. Univ. of Mich.*, 453 F. Supp. 3d 937, 967 (E.D. Mich. 2020) (finding university's published report, focused on a professor's relationship with the plaintiff, to be "mean-spirited" and "filled with innuendo and rumor regarding the plaintiff's sexuality, lifestyle, and personality" but not an adverse action).

Additionally, as with the classroom placement, plaintiffs have not shown a causal connection between the protected activity and the assembly. The assembly occurred more than a year and a half after the report of A.T.'s assault, and thus, any inference of temporal proximity would be extinguished. *See Belmont Univ.*, 367 F. Supp. 3d at 760 (citations omitted). Therefore, as plaintiffs have failed to establish a *prima facie* case of Title IX retaliation, their claim fails as a matter of law.

Accordingly, defendants' motion [Doc. 37] will be **GRANTED** as to plaintiffs' Title IX retaliation claim against CCSBE.

### D.    Section 1983 Claims – All Defendants

"To prevail on a § 1983 claim, a plaintiff must establish that a person acting under color of state law deprived the plaintiff of a right secured by the Constitution or laws of the United States." *Waters v. City of Morristown*, 242 F.3d 353, 358–59 (6th Cir. 2001). Here, the parties do not dispute that CCSBE or the individual defendants[8] were acting under the color of law.

Plaintiffs allege that all defendants violated A.T.'s Fourteenth Amendment rights to bodily integrity and equal protection of the law. As relevant in this action, "the Fourteenth Amendment's Due Process Clause and Equal Protection Clause provide limited ways for plaintiffs to bring constitutional-based peer-harassment claims against state actors." *Doe v. Sumner Cnty. Bd. of Educ.*, No. 3:19-cv-1172, 2020 WL 5797980, at *4 (M.D. Tenn. Sept. 29, 2020) (hereinafter "*Sumner*") (citing *Jane Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 931 (6th Cir. 2020) (hereinafter "*Jackson Loc.*") (noting that only state actors (not students) can violate the Constitution under § 1983, which "creates difficulty for plaintiffs asserting constitutional violations [against school boards] arising out of peer harassment")).

### i.    Substantive Due Process — Bodily Integrity

The Due Process Clause of the Fourteenth Amendment provides that no "State [shall] deprive any person of life, liberty, or property, without due process of law." U.S. Const amend.

---

[8] Suing a government official in their official capacity is equivalent to suing the governmental entity. *Epperson v. City of Humboldt*, 140 F. Supp. 3d 676, 683 (W.D. Tenn. 2015) (dismissing § 1983 claims against individual defendants in their official capacities because such claims are duplicative as they are to be treated as a suit against the entity). Thus, the liability of the individual defendants will only be considered as they are sued in their individual capacities.

38

XIV, § 1. Students have a "clearly established right under the substantive component of the Due Process Clause to personal security and to bodily integrity," and "that right is fundamental." *Doe v. Claiborne Cnty.*, 103 F.3d 495, 507 (6th Cir. 1996). The Sixth Circuit has made it clear though that "[g]enerally, substantive due process does not impose a constitutional duty on a school to protect students from harm inflicted by private actors, such as their classmates." *Shively ex rel. T.S. v. Green Loc. Sch. Dist. Bd. of Educ.*, 579 F. App'x 348, 355 (6th Cir. 2014) (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989)).

There are two exceptions, however, to this general rule that the state has no obligation to protect its citizens against harm by private actors: (1) where the state "enters into a 'special relationship' with an individual by taking that person into its custody," and (2) where the state "creates or increases the risk of harm to an individual." *Stiles*, 819 F.3d at 853. As the defendants argue, and as the Court finds, neither of these exceptions apply.

First, the "special relationship" exception does not apply because the Sixth Circuit has "repeatedly held that students in schools are not in state 'custody.'" *Jackson Loc.*, 954 F.3d at 931–32 (citations omitted); *accord Stiles*, 819 F.3d at 854; *Soper v. Hoben*, 195 F.3d 845, 853 (6th Cir. 1999) (finding no special relationship between school officials and plaintiff who was sexually assaulted by other students on school grounds). Thus, plaintiffs cannot show a special relationship between A.T. and CCSBE or the individual defendants.

To succeed under the second exception, "state-created danger," the plaintiff must establish: (1) "an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party"; (2) "a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished

39

from a risk that affects the public at large"; and (3) "the state knew or should have known that its actions specifically endangered the plaintiff." *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003) (citing *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998)); *accord Stiles*, 819 F.3d at 854. "The ultimate question in determining whether an affirmative state action increased danger to an individual is whether the individual was safer before the state action than after it." *Stiles*, 819 F.3d at 854 (citing *Jasinski v. Tyler*, 729 F.3d 531, 539 (6th Cir. 2013)). The state-created danger exception is a "demanding standard for constitutional liability." *Jones v. Reynolds*, 438 F.3d 685, 691 (6th Cir. 2006) (quoting *Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 913 (6th Cir. 1995)).

Plaintiffs claim defendants "fail[ed] to take appropriate measures," "fail[ed] to adequately supervise and train (or engage in supervision)," and "act[ed] with manifest indifference" to the sexual assault and harassment of A.T. [Doc. 21 ¶ 87]. In sum, plaintiffs allege that it was CCSBE's *failure to act* that deprived A.T. of substantive due process. *See Sumner*, 2020 WL 5797980, at *5. The Sixth Circuit has made it clear that a "failure to act is not enough," as evidenced through the frequent rejection of "a plaintiff's due process claim 'because challenged conduct either was not an affirmative act at all or did not create or increase the risk of private violence to the plaintiff.'" *Lipman v. Budish*, 974 F.3d 726, 744 (6th Cir. 2020) (quoting *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 465 (6th Cir. 2006)). Accordingly, plaintiffs' claim that defendants violated A.T.'s bodily integrity fails as a matter of law because the plaintiffs do not set forth any affirmative action taken by the defendants.

Although plaintiffs do not present any affirmative actions in their specific claim of § 1983, their complaint contains the two affirmative actions which defendants recognize and discuss: (1) the placement of A.T. and J.B. in the same class in October 2020; and (2) the

40

seventh-grade virtual assembly held by Ingram in April 2021. Turning first to the classroom placement of A.T. and J.B., defendants argue that class assignments at CMS are computerized and not created by the defendants, and that plaintiffs have not alleged that any of the individual defendants participated in assigning A.T. and J.B. to the same class [Doc. 39, pp. 35–36]. Furthermore, defendants argue that damage claims against government officials arising from alleged violations of constitutional law must allege facts that demonstrate what *each* defendant did to violate the asserted constitutional right, and plaintiffs have failed to do so [*Id.* at 36].

While plaintiffs do not directly respond to defendants' arguments, plaintiffs do assert that Laing was responsible for overseeing class assignments, and thus, she had a duty not to place A.T. and J.B. in the same classroom [Doc. 41, p. 12]. At best, what plaintiffs describe of Laing is an inaction, or a failure to act, rather than an affirmative act. And, even if the Court were to assume an affirmative act on the part of Laing, in that she allowed the placement, such act as alleged here cannot meet the demanding standard for constitutional liability. Of note, the Sixth Circuit has found that ignoring a dangerous situation and "[e]ven affirmatively returning a victim to a preexisting situation of danger" does not create or increase a victim's risk of harm. *Stiles*, 819 F.3d at 855 (citations omitted); *see also McQueen v. Beecher*, 433 F.3d 460, 465–70 (6th Cir. 2006) (finding that a teacher's act of leaving students unsupervised in a classroom with another student known to have disruptive and sometimes violent behavior did not create or increase the risk that the former students would be harmed by the latter student); *Reynolds*, 438 F.3d at 691 (finding that officers who came upon and failed to stop an illegal drag race did not increase the risk of danger to the plaintiff); *Bukowski v. City of Akron*, 326 F.3d 702, 709 (6th Cir. 2003) (holding that police officers' act of returning a victim to the house where she was originally found did not increase plaintiff's danger of being raped by the occupant of that

41

house again); *Deshaney*, 489 U.S. at 201 (stating that returning the minor victim to his father's abusive custody "placed him in no worse position than that in which [the victim] would have been had [the State] not acted at all"). Therefore, under this jurisprudence, no matter if plaintiffs categorize Laing's actions as ignoring a dangerous situation or returning A.T. to situation of danger with J.B., the act did not create or increase the risk that A.T. would be exposed to an act of violence by a third party. Moreover, A.T. was placed in a classroom setting with J.B., a setting in which an authority figure, a teacher, was present. *Cf. Lopez v. Metro. Gov't of Nashville & Davidson Cnty.*, 646 F. Supp. 2d 891, 910 (M.D. Tenn. 2009) (finding that the defendant's placement of the special-needs victim on the same school bus as a student with a history of inappropriate sexual behavior, where the victim had "free reign" and no monitor, could be found to be a state-created danger).

Turning to the virtual assembly, the Court does not find anything in the record to indicate or suggest that the assembly created or increased the risk that A.T. would be exposed to an act of violence by a third party. Further, there is nothing to suggest that the assembly created a special danger to A.T, specifically as distinguished from the rest of the students at the assembly, let alone the public at large. While the Court acknowledges and understands plaintiffs' perception of the assembly as insensitive and directed, the assembly does not meet the elements required to be a state-created danger.

Therefore, plaintiffs' claim that the defendants violated A.T.'s Fourteenth Amendment right to bodily integrity fails as a matter of law, and defendants are entitled to summary judgment on that claim.

### ii.     Equal Protection — § 1983

There are "two methods of proving an equal protection violation based on a school official's response to peer harassment: (1) disparate treatment of one class of students who complain about bullying as compared to other classes of students, and (2) deliberate indifference to discriminatory peer harassment." *Sumner*, 2020 WL 5797980, at \*5 (citing *Stiles*, 819 F.3d at 851–52). As indicated by plaintiffs' response, plaintiffs are proceeding on only the second ground [Doc. 41, p. 6]. Thus, the Court will only address deliberate indifference.

### 1.     Deliberate Indifference

To make out a claim for deliberate indifference under the Equal Protection Clause, a plaintiff must demonstrate two things. *See Stiles*, 819 F.3d at 852. First, the plaintiff must "offer evidence that [s]he was subject to discriminatory peer harassment." *Id.* (citations omitted). Second, the plaintiff must "offer evidence that school officials responded to the discriminatory peer harassment with deliberate indifference, i.e. in a manner clearly unreasonable in light of known circumstances." *Id.* (citing *Shively*, 579 F. App'x at 357). "The deliberate indifference standard used for proving a § 1983 equal protection violation in peer harassment cases is 'substantially the same' as the deliberate indifference standard applied in Title IX cases." *Stiles*, 819 F.3d at 852 (citing *Williams ex rel. Hart v. Paint Valley Loc. Sch. Dist.*, 400 F.3d 360, 369 (6th Cir. 2005)).

The Court does not find the school's response to the incident between A.T. and J.B. to be "clearly unreasonable in light of the known the circumstances." The deliberate indifference standard, under Title IX claims and as applicable here, is a high bar. *Stiles*, 819 F.3d at 848. "It requires only that school administrators respond to known peer harassment in a manner that

43

is not 'clearly unreasonable in light of the known circumstances.'" *Id.* (quoting *Davis*, 526 U.S. at 648). Deliberate indifference is not a negligence standard, and it does not mean "a collection of sloppy, or even reckless, oversights." *Claiborne Cnty.*, 103 F.3d at 508; *accord Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 365 (6th Cir. 2012). In fact, no one particular response is required, and school districts are not required to eradicate all sexual harassment. *Vance v. Spencer Cnty. Pub. Schs. Dist.*, 231 F.3d 253, 260–61 (6th Cir. 2000). Courts, furthermore, should refrain "from second-guessing disciplinary decisions made by school administrators." *Davis*, 526 U.S. at 648.

Transplanting plaintiffs' Title IX deliberate indifference arguments here, plaintiffs opine that two situations establish defendants' deliberate indifference [Doc. 41, pp. 12–15]. First, plaintiffs allege that defendants were deliberately indifferent to A.T.'s situation "because soon thereafter, [d]efendants placed her in a classroom with the very individual who sexually assaulted and threatened to rape her" [*Id.* at 12]. As defendants point out in their reply [Doc. 44, p. 10], plaintiffs' characterization of the placement of A.T. and J.B. in the same classroom together as "soon thereafter" is a misstatement. A.T. and J.B. were placed in the same classroom together in October 2020, over a year after CCSBE gained knowledge of the sexual harassment. Therefore, the placement cannot be said to be "soon thereafter" actual knowledge was acquired of the sexual harassment. *See generally Belmont Univ.*, 367 F. Supp. 3d at 760 (citation omitted) ("[I]n certain circumstances, temporal proximity between events can be close enough in time to constitute sufficient evidence of a causal connection for the purposes of a *prima facie* retaliation case."). Additionally, while plaintiffs claim that Laing was responsible for the overseeing of class placement of students, "and was the very individual responsible for A.T. being placed in the same class as her assailant," the class placement was

44

done by a computerized system. Even if Laing was negligent in not ensuring that A.T. and J.B. were not placed in the same classroom, this would not amount to deliberate indifference. *See Pahssen*, 668 F.3d at 365 ("Negligence, however, does not establish deliberate indifference.").

Furthermore, the school had not received the Mutual No Contact Order between A.T. and J.B. at the time the computerized placement occurred. B.G. did not upload the Order when filling out the Returning Registration Form for A.T. prior to her beginning seventh grade, and the first time any school employee knew of the Order was when J.G. emailed a copy to Ingram in October 2020, after A.T. realized she was placed in the same class as J.B. and called J.G. Once Ingram was made aware of the Mutual No Contact Order, A.T. was given the option to stay in the same class or switch to another class, and A.T. chose to switch to another class. Defendants' actions, therefore, cannot be said to amount to deliberate indifference here.

Plaintiffs also contend that defendants were deliberately indifferent to A.T. by subjecting her to an assembly in which the subject of sexual harassment was explicitly discussed in relation to lawsuits [Doc. 41, pp. 14–15]. Plaintiffs allege that Ingram knew that a lawsuit had been filed against CMS the year prior, and Ingram was aware the suit involved a sixth-grade student [*Id.* at 14]. In turn, plaintiffs argue that Ingram knew or should have known that the sixth-grade student at the center of the lawsuit would be in his virtual assembly as a seventh grader a year later [*Id.*]. Plaintiffs contend that Ingram poked fun and made light of sexual assault during the assembly and stated "sexual assault usually occurs when students 'horseplay'" [*Id.*]. Ingram's actions during the assembly, plaintiffs argue, created a "hostile environment" for A.T. [*Id.*].

Defendants argue that Ingram was not aware of the which students were attending the assembly nor was Ingram aware of any of the attending students' backgrounds involving sexual assault, battery, or harassment [Doc. 44, pp. 15–16]. Furthermore, defendants note that the assembly took place well over a year after the school had actual knowledge of the sexual harassment of A.T. [*Id.* at 16]. Lastly, defendants argue that even if Ingram referenced sexual assaults and potential lawsuits, 'it is unclear how educating students on the possible ramifications of their actions could amount to deliberate indifference by a school system" [*Id.*].

The Court does not find that the virtual assembly held by Ingram in April 2021, over a year and seven months after the school obtained actual knowledge of the sexual assault of A.T., establishes deliberate indifference. Deliberate indifference is related to how the school responds to the incident of sexual harassment. And from the record, it is clear that the school responded immediately upon obtaining knowledge that A.T. had been sexually assaulted, obtaining statements from those involved, immediately punishing the assailant, and referring the matter to the SRO. Additionally, upon J.B.'s return to the school, the school kept him separated from A.T., even when J.B. began to reintegrate into the general student population. Furthermore, it is difficult to categorize the virtual assembly as a "response" to the sexual assaults A.T. experienced given the virtual assembly occurred well over a year after the school gained actual knowledge of the sexual assaults. Thus, while perhaps inartful in parts of its presentation, the Court does not find that the virtual assembly establishes defendants' deliberate indifference to discriminatory peer harassment.

Because plaintiffs cannot prevail on their equal protection claim under the deliberate indifference theory on which they proceed, plaintiffs' claim fails as a matter of law.

46

### iii. Municipal Liability — § 1983

Plaintiffs also assert a § 1983 claim of municipal liability against CCSBE for its actions "taken pursuant to customs, policies, or practices of failing to investigate, failing to adequately train and supervise, and a historical indifference to the bodily integrity of students" [Doc. 21 ¶ 88]. Plaintiffs also allege that the individual defendants "were considered policymakers for the purpose of implementing and carrying on the aforesaid policies, customs, and practices [*Id.* ¶ 89].

To establish a claim for municipal liability under § 1983, a plaintiff must show (1) they were deprived of a constitutional right, and (2) that the defendant was responsible for that violation. *See Claiborne Cnty.*, 103 F.3d at 505–06. Regarding the second element, "the School Board cannot be found liable unless the plaintiff can establish that an officially executed policy, or the toleration of a custom within the school district leads to, causes, or results in the deprivation of a constitutionally protected right." *Id.* at 507 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978)). "Municipal liability may attach for policies promulgated by the official vested with final policymaking authority for the municipality." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 813 (6th Cir. 2005) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482–83 (1986)).

Whether a given individual is a "policymaker" for purposes of § 1983 is a question of state law. *Id.* (citing *Pembaur*, 475 U.S. at 483). "[A]n official is a policymaker if the official's actions are '(1) final, (2) not reviewable, and (3) unconstrained by the existing policies and practices of his supervisor[s],' or where the official has been delegated 'unfettered discretion.'" *Doe v. Farmer*, No. 3:06-0202, 2009 WL 3768906, at *12 (M.D. Tenn. Nov. 9, 2009) (quoting *Monistere v. City of Memphis*, 115 F. App'x 845, 852–53 (6th Cir. 2004)). Under Tennessee

47

Code Annotated § 49-2-203(b)(2), principals are to act "under the supervision of the director of schools and in accordance with the written policies of the local board of education for the planning, management, operation and evaluation of the education program of the schools to which assigned." Clearly in Tennessee, a principal's actions are not unconstrained or exercised with unfettered discretion. Thus, principals, let alone teachers or counselors, cannot be said to be policymakers for purposes of § 1983 municipal liability.

Because this Court has found, for reasons stated *supra*, no constitutional deprivations for which CCSBE could be held liable, plaintiffs cannot establish a claim of municipal liability under § 1983. Furthermore, the individual defendants identified as "policymakers" cannot be categorized as such, and thus, plaintiffs' argument that CCSBE took actions pursuant to policies, customs, and practices the individual defendants implemented and carried out fails.

For the reasons stated above, defendants' motion [Doc. 37] will be **GRANTED** as to plaintiffs' § 1983 claims against all defendants.

### E. *Monell* Liability for Failure to Train and Supervise (18 U.S.C. § 1983) – All Defendants

As stated *supra*, plaintiffs have failed to demonstrate the deprivation of a constitutional right as required to proceed under a § 1983 claim. Accordingly, defendants' motion [Doc. 37] will be **GRANTED** as to plaintiffs' § 1983 claim for failure to train and supervise as to all defendants.

### F. State Law Claims – All Defendants

#### i. CCSBE's Immunity Under GTLA

The GTLA provides that "all governmental entities shall be immune from suit for any injury which may result from the activities of such governmental entities wherein such

48

governmental entities are engaged in the exercise and discharge of any of their functions, governmental or proprietary." Tenn. Code Ann. § 29-20-201. "Governmental entity" is defined as "any political subdivision of the state of Tennessee including . . . [a] school district . . . ." *Id.* § 29-20-102(3)(A). Thus, CCSBE is considered a governmental entity. *See Brown v. Bd. of Educ. of Shelby Cnty. Schs.*, 47 F. Supp. 3d 665, 678 (W.D. Tenn. 2014 (finding the GTLA provided governmental immunity to the school board). Under the GTLA, governmental entities are immune from suit except in instances where immunity is removed. *Id.* § 29-20-201. The GTLA removes immunity for "injury proximately caused by a negligent act or omission of any employee within the scope of his employment." *Id.* § 29-20-205. There is an exception to this removal of immunity whereby immunity is retained where injuries arise out of "false imprisonment pursuant to a mittimus from a court, false arrest, malicious prosecution, intentional trespass, abuse of process, libel, slander, deceit, interference with contract rights, infliction of mental anguish, invasion of right of privacy, or *civil rights*." *Id.* § 29-20-205(2) (emphasis added).

The GTLA's "civil rights" exception includes claims arising out of the same set of circumstances as a claim under § 1983 and Title IX. *See Johnson v. City of Memphis*, 617 F.3d 864, 872 (6th Cir. 2010) (holding the plaintiff's negligence claim against a city was barred under the GTLA because it arose out of the same circumstances giving rise to the plaintiff's civil rights claim under § 1983); *Doe v. Jackson Madison Cnty. Bd. of Educ.*, No. 17-01174, 2018 WL 2927777, at *4 (W.D. Tenn. June 7, 2018) (finding the plaintiff's negligence claims arose out of the same facts and circumstances as her civil rights claims under both § 1983 and Title IX, and therefore, such claims must be dismissed under the GTLA's civil rights exception to the waiver of immunity). An injury arises out of civil rights when a civil-rights violation is

49

the "gravamen," "substantial point," or "real purpose" of the complaint. *Mosier v. Evans*, 90 F.4th 541, 552–55 (6th Cir. 2024). A plaintiff cannot avoid a defendant's immunity by couching its civil rights claim as one of negligence. *Campbell v. Anderson Cnty.*, 695 F. Supp. 2d 764, 778 (E.D. Tenn. 2010).

Plaintiffs' tort claims of intentional and negligent infliction of emotional distress, negligence per se, and violation of the GTLA (alleging negligence, negligent supervision, negligent failure to train, and negligence per se) brought against CCSBE are predicated on the alleged violation of plaintiffs' civil rights under § 1983 and Title IX. Additionally, the Court finds that the alleged civil-rights violations in this action are the gravamen, or real purpose, of the complaint. Therefore, because plaintiffs' negligence claims arise out of the same facts and circumstances as their civil rights claim, they fall within the civil rights exception to the waiver of immunity set forth in the GTLA. Thus, regarding plaintiffs' state law claims against CCSBE, defendants' motion [Doc. 37] is **GRANTED**.

### ii.    Individual Defendants' Immunity

Defendants argue that they have immunity under the GTLA against plaintiffs' state law negligence claims [Doc. 39, pp. 48–49]. In their surresponse, plaintiffs argue that the individual defendants are not entitled to dismissal based on qualified immunity because defendants knowingly violated the law, specifically Tennessee Code Annotated § 37-1-605(d)(1), the Tennessee State Mandatory Reporting Act [*Id.*]. As plaintiffs have sued the individual defendants in both their official and individual capacities [Doc. 21 ¶¶ 6–11], the Court will address each capacity in turn.

50

## 1. Official Capacity

As stated previously, the GTLA recognizes that Tennessee "governmental entities" are broadly immune from state-law tort liability. *See* Tenn. Code Ann. § 29-20-201(a). "This immunity extends to state-law tort claims against officials sued in their official capacities." *Mosier*, 90 F.4th at 550 (citing *Siler v. Scott*, 591 S.W.3d 84, 102 (Tenn. Ct. App. 2019)). Accordingly, for the same reasons discussed above, defendants' motion [Doc. 37] will be **GRANTED** as to plaintiffs' state-law claims against the individual defendants in their official capacities.

## 2. Individual Capacity

When a governmental employer retains immunity under one of the exceptions in Tennessee Code Annotated § 29-20-205 for a particular claim, "the plaintiff may maintain that claim against a governmental employee in his or her individual capacity." *Morrow v. Metro. Gov't of Nashville & Davidson Cnty.*, No. 3:19-cv-351, 2020 WL 5106763, at *4 (M.D. Tenn. Aug. 31, 2020) (citations omitted); *accord Mosier*, 90 F.4th at 555 (stating that GTLA immunity afforded to governmental entities does not extend to the employee in their personal capacity). Because CCSBE, the governmental entity that employed the defendants, is immune from suit on plaintiffs' state law claims, plaintiffs may bring state law claims against the individual defendants in their individual capacities as the GTLA does not apply to such claims. *See Morrow*, 2020 WL 5106763, at *4. Therefore, plaintiffs' state-law claims against the individual defendants in their individual capacities may stand as no such GTLA immunity exists.

However, since GTLA does not apply to individual defendants in their individual capacities, plaintiffs' claims under GTLA against the individual defendants are dismissed.

51

Therefore, only plaintiffs' claims against the individual defendants in their individual capacities for negligent and intentional emotional distress and negligence per se remain.

Defendants argue that this Court should decline to exercise supplemental jurisdiction over plaintiffs' state law claims in the event that the federal claims are dismissed [Doc. 39, pp. 49–50]. A court may decline to exercise supplemental jurisdiction over claims if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. 1367(c)(3). Exercising such discretion here, as the Court has found that defendants are entitled to summary judgment on all federal questions, the Court declines to exercise supplemental jurisdiction over plaintiffs' remaining state law claims. Accordingly, defendants' motion [Doc. 37] will be **GRANTED** as to plaintiffs' remaining state law claims.

## IV.     Conclusion

For the reasons above, defendants' motion for summary judgment [Doc. 37] is **GRANTED**, and this case is **DISMISSED**. Accordingly, all pending motions [Docs. 51, 59, 60] are **DENIED as moot**. An appropriate order will follow.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE